1  The following is the PDF of an official transcript.  Official

2  transcripts may be filed in CM/ECF only by the Official Court

3  Reporter and will be restricted in CM/ECF for a period of 90

4  days.  You may cite to a portion of the attached transcript by

5  the docket entry number, referencing page and line number,

6  only after the Court Reporter has filed the official

7  transcript; however, you are prohibited from attaching a full

8  or partial transcript to any document filed with the Court.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION


 3


 4  UNITED STATES OF AMERICA,      )
                                   )  CRIMINAL ACTION NO.
 5         VS.                     )  1:22-CR-311-VMC-CCB-1
                                   )
 6                                 )  SENTENCING HEARING
    AQUIL MUHAMMAD,                )
 7                                 )
                   DEFENDANT.      )
 8  _____)

 9  ------------------------------------------------------------

10      BEFORE THE HONORABLE JUDGE VICTORIA M. CALVERT
               TRANSCRIPT OF SENTENCING HEARING
11                      JULY 6, 2023

12  ------------------------------------------------------------
    APPEARANCES OF COUNSEL:
13
    For the Government:        CHRISTOPHER J. HUBER
14                             United States Attorney's Office

15

16  For the Defendant:         MARK R. JEFFREY
                               Jeffrey Law Group, LLC
17

18

19

20       Proceedings recorded by mechanical stenography
           and computer-aided transcript produced by
21
                 KEISHA M. CRUMP, RMR, RCR
22                 Official Court Reporter
                   1759 U.S. Courthouse
23                 75 Ted Turner Drive, SW
                   Atlanta, Georgia  30303
24                    (404) 215-1354

25
```

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; July 6, 2023, 9:58 a.m.)**

1           THE COURT:  This is the United States of America versus -- Aquil?

THE DEFENDANT:  Aquil.

THE COURT:  -- Muhammad, 1:22-CR-311.  Can I have appearances from counsel.

MR. HUBER:  Good morning, Your Honor.  Christopher Huber for the United States.

THE COURT:  Good morning.

MR. JEFFREY:  And good morning, Your Honor.  Mark Jeffrey with Mr. Muhammad.

THE COURT:  Good morning to both of you.  And good morning to our probation officer.  I thought Ms. Schuessler would be here.

PROBATION OFFICER:  She had something to do with her family, so I covered for her.

THE COURT:  All right.  Well, good morning.

PROBATION OFFICER:  Good morning.

THE COURT:  All right.  So on March 9, 2023, Mr. Muhammad entered a written negotiated plea of guilty to Count 1 of the indictment charging him with conspiracy to commit wire fraud.  I have received the pre-sentence report.

Mr. Jeffrey, have you reviewed it with your client?

1           MR. JEFFREY:  Yes, Your Honor.

2           THE COURT:  All right.  And in addition to the

3  pre-sentence report, I also reviewed the sentencing memorandum

4  filed by Mr. Jeffrey, which included five character letters,

5  and the response filed by Mr. Huber, as well as the victim

6  impact statement provided to me yesterday.  Is there anything

7  else?

8           MR. JEFFREY:  No, ma'am.

9           MR. HUBER:  Not from the Government, Your Honor.

10           THE COURT:  All right.  All right, so based on my

11  review of the pre-sentence report, there are no objections to

12  the calculations or any other -- I didn't see any other

13  factual objections.  Is that correct?

14           MR. HUBER:  That is correct, Your Honor.

15           MR. JEFFREY:  No objections from the defense, Your

16  Honor.

17           THE COURT:  All right.  So I will adopt the findings

18  of fact and conclusions of law in the pre-sentence report to

19  which no objection has been made, and I will now turn to the

20  calculation of the advisory guideline range.

21           MR. HUBER:  And before you do that, Your Honor, I

22  don't know when you want to address the two-level variance

23  that we're agreeing to, whether it's before or after you do

24  the guideline range.

25           THE COURT:  It seems -- I think that I've been doing

1  it after because I didn't know if that two levels affects the

2  fine guideline range and all of those things.  But it's not

3  technically in place, so I have been treating it as a

4  variance.

5      MR. HUBER:  Okay.  That -- yeah, and that's fine.  I

6  just wanted to make sure.  Again, I knew you had read the

7  memos that's in play, and I didn't want to get too far down

8  the road and have you surprised if you hadn't remembered that,

9  so.

10     THE COURT:  Sure.  All right.  So I'll just do it as

11 a variance after I make the calculation, which is I'm just

12 going to restate what's in the pre-sentence report, so.

13     All right.  As set forth in paragraph 32, the base

14 offense level is seven.  As set forth in paragraph 33, 12

15 levels are added since the loss is more than $250,000 but less

16 than $550,000.  As set forth in paragraph 35, there is a

17 two-level adjustment for abuse of a position of public or

18 private trust, and that results in an adjusted offense level

19 of 21.

20     As set forth in paragraph 39, three levels are

21 deducted for Mr. Muhammad's acceptance of responsibility.

22 That results in a total offense level of 18.  Mr. Muhammad has

23 no criminal history, so his criminal history category is one.

24 That results a total offense level of 18 with a criminal

25 history category of one, results in a custody guideline range

1    of 27 to 33 months.  The fine guideline range is 10,000 to

2    100,000.  And there's a special assessment of $100,

3    restitution of $447,876, supervised release of up to three

4    years.

5            Are there any objections to the guideline range?

6            MR. HUBER:  No, Your Honor.

7            MR. JEFFREY:  No, ma'am.

8            THE COURT:  All right.  So as Mr. Huber has alluded

9    to, it seems like the parties are in agreement that there

10   should be a two-level -- I'll say, I guess, downward variance

11   or adjustment based on the anticipated changes to the

12   guidelines.

13           Mr. Huber, do you want to put that on the record?

14           MR. HUBER:  Yes, I do.  So we do agree that there

15   should be a two-level downward variance for the proposed 4C1.1

16   guideline, which -- for defendants who have no criminal

17   history as a two-level downward variance.

18           Our recommendation for that is based on our

19   understanding that Mr. Muhammad is waiving any right to ask

20   for -- again, if those amendments are, in fact, put in place,

21   so he gets the benefit now, doesn't get to get double benefit

22   later.  But, yes, that would be our -- given the amendments,

23   we are recommending that two-level downward variance.

24           THE COURT:  All right.

25           MR. JEFFREY:  And, Your Honor -- Your Honor, the

1  Government's understanding is correct that we do appreciate

2  the Government's -- that overture.  We had proposed that.

3  And, yes, he -- he will agree he will not seek that afterwards

4  if and when that guideline becomes law.

5           THE COURT:  All right.  And, Mr. Muhammad, do you

6  agree with what Mr. Jeffrey has just stated?

7           THE DEFENDANT:  Yes, ma'am.

8           THE COURT:  All right.  All right, so with that

9  two-level downward variance, the guideline range is now 21 to

10  27 months.  Okay.  So I will now hear from the parties as to

11  what a fair and reasonable sentence is.

12           Mr. Huber, I was going to start with you, and I'm

13  hoping you could give me a little bit more information about

14  how the loss was calculated.

15           MR. HUBER:  Certainly, Your Honor.

16           First, I wanted to let you know that there are three

17  individuals from Delta Airlines here today at the sentencing:

18  Paulette Henderson, who's the general manager of revenue

19  protection; Tammy Davis, who's the program manager of revenue

20  protection; and Ray Pitesky, the manager of corporate

21  security.  Delta takes the fraud against it very seriously,

22  and as -- as you know, submitted the victim impact statement,

23  which you've read, and I've provided to both -- both the Court

24  and the defendant.

25           As you saw both in the -- in the indictment and in

1  the PSR, this was not a one-time theft.  There was a single

2  count of conviction.  It was conspiracy, but it wasn't a

3  one-time theft.  Mr. Muhammad went to work for Delta day after

4  day, week after week, month after month for over a year and

5  submitted -- created fraudulent, false tickets that he sold to

6  friends and -- and acquaintances over 200 times.  Essentially,

7  for the period when he was doing it, he was -- it averaged a

8  ticket a day, a fraudulent ticket a day, over $440,000 worth

9  of fraudulent tickets.

10        And you ask how the 447,000 was -- was developed.  So

11 Delta, of course, has a ticketing system that prices tickets,

12 and that price varies from day-to-day from -- potentially,

13 from minute to minute based on what sort of ticket it is, what

14 the route is, what seats are available on the -- the plane at

15 the time.  And so Delta knows -- was able to identify the

16 240-plus tickets that Mr. Muhammad fraudulently issued and

17 priced those tickets.  The loss is the -- what would have been

18 the cost of those tickets when they were issued by Mr.

19 Muhammad.

20        In addition to that, there were actual -- so that was

21 lost revenue.  If -- if those tickets had been sold to a

22 paying customer at the time Mr. Muhammad -- to the passenger

23 who actually flew, if they had paid for those tickets, that's

24 what the loss reflects.  So there's the ticket price.

25        On top of that, for each ticket, Delta has to pay

1  taxes and fees, so airlines start -- airports, excuse me,

2  charge fees to take off and land.  There are aviation taxes on

3  every ticket, so that's actual -- for each ticket Mr. Muhammad

4  issued, there was actual money that Delta had to pay for those

5  tickets.

6          So the total loss, the 447, is a combination of the

7  two, the -- the lost revenue from that seat being sold for

8  free, essentially, plus then the taxes, the taxes and fees

9  associated with each of those tickets, each of the -- the

10 flown in -- and frequently, it's by segments, so if the ticket

11 has a stop, you know, if it's a round trip with a stop, that's

12 four segments, so there are additional fees.  But -- but those

13 fees were all broken down.  The ticket price and those fees

14 and taxes were all broken down and sum up to that $447,000, so

15 that's where that number comes from.

16         THE COURT:  And can you explain what Mr. Muhammad did

17 in terms of the certificates just...

18         MR. HUBER:  So I think I understand it.  There are

19 several different certificates that Mr. Muhammad was -- was

20 using.  He was able to identify a -- I'll say a flaw in the

21 Delta ticketing system, which allowed him to issue the

22 pre-tickets, but that doesn't cover those taxes that -- and

23 the fees, the actual money that needed to be paid that needed

24 to come into the system somehow.

25         So he issued fraudulent tick -- certificates, like a

1  travel voucher that you might get if you're, you know, bumped

2  off of a flight or what have you.  And then those vouchers

3  have some cash value, and he's able -- and he backs off, uses

4  them to pay to -- in the system, in the Delta system, pay the

5  fees and taxes.  So the -- so it's all within the system he

6  creates a voucher that then he uses to offset, he used to

7  offset the fees and taxes.  There wasn't actual money or

8  anything actually put into the system.

9        THE COURT:  So would Mr. Muhammad have been aware of

10  the amount of taxes and write-offs, or is it...?

11        MR. HUBER:  He -- I believe he would have been aware

12  of the -- certainly the tax amounts that he was doing.  I

13  don't know enough of the details about when he put in for the

14  zero-fare tickets if he saw the actual fare that would have

15  been paid, so I don't know if he would have known the full

16  447,000, but my understanding is he would have known at least

17  the actual cash out of -- out of Delta's pockets that went

18  with the ticket.

19        But, no, I don't -- I don't know when he was actually

20  looking at the screen issuing the zero-fare tickets whether it

21  showed what that ticket would have cost had a -- had a

22  passenger actually been purchasing it.

23        THE COURT:  All right.  And you mentioned at the

24  start that he sold it to friends and acquaintances.  But from

25  my review of the pre-sentence report, it almost looks like

1   Mr. Brown may have been the intermediary.

2          MR. HUBER:  So for the charged conspiracy, Mr. Brown

3   was the intermediary, but Mr. Brown only was on a subset of

4   the tickets that Mr. Muhammad issued, so there are a fair

5   number of tickets.  So for -- for the tickets where Mr. Brown

6   brought the traveler to Mr. Muhammad, those tickets were

7   issued with Mr. Brown's email address on the ticket identified

8   or in -- in the system.

9          There are a lot of other tickets where Mr. Muhammad's

10  email was the email in the system where it was him directly,

11  family members -- giving tickets directly to family members or

12  other individuals not with Mr. Brown.

13         The charge conspiracy was specifically Mr. Brown.

14  And the 447,000 is all of the tickets that Mr. Muhammad issued

15  on the zero-fare basis that were identified by Delta, which is

16  greater than those issued through Mr. Brown, if that makes

17  sense.

18         THE COURT:  It does.  And do you have any sense of

19  how much Mr. Muhammad received from this activity?

20         MR. HUBER:  What we have are like PayPal records,

21  which seems to be a subset of -- they are -- they don't -- we

22  do not have payments for each of the tickets, so for each of

23  the 240-plus tickets that were issued, we don't have a

24  corresponding payment.  We have -- and even for all of the

25  tickets that went through Mr. Brown, we don't have a

1  corresponding -- we have some corresponding payments, but we

2  don't have all of them.  So we don't have -- I think we

3  believe -- we don't have evidence, but we believe that there

4  were some that were paid in cash, for instance, or paid in

5  ways that we didn't identify, and so we don't have a total.

6  But, certainly, he wasn't -- well, actually, let me see.

7          When he was -- he was getting from Mr. Brown on the

8  order of 100 to $150 a ticket.  For many of those tickets, if

9  not all of those tickets, Mr. Brown -- the ones that Mr. Brown

10 was selling, Mr. Brown obtained a portion of the fee as well.

11 But, for instance -- so for Counts 5 and 6, for instance,

12 those were tickets -- two sets of tickets.  Mr. Muhammad was

13 paid $250, so 100 -- essentially, $125 for each of those

14 tickets.  There was another that he was -- for a set of

15 tickets, he was paid $300, so $150 for each of those tickets.

16 But there were some -- Count 2, for instance, Mr. Muhammad was

17 paid a full $300 for a single -- for a single ticket.

18         So from the records we have, it appeared that he was

19 paid from Mr. Brown between $100 to $300 per ticket.  I do

20 believe that some of the tickets he issued, he issued to

21 family and likely did not charge those.  I mean, I -- I think

22 his wife and other family members, I think we suspect that

23 those were just free tickets that he didn't pay for, but for

24 the individuals outside of his family, in that $100 to $300

25 range per ticket.

1          So even if every ticket were in that range, it would

2    be less than the money lost by Delta for the tickets, but it's

3    not -- not in substantial for -- for, you know, issuing free

4    tickets at no cost to him.

5          THE COURT:  And the pre-sentence report mentioned

6    it -- it seems like there was some issues in the office

7    Muhammad -- Mr. Muhammad was working at.  Yeah, the Minnesota

8    office, and it mentions a Vincent Moore.  Has anyone else been

9    prosecuted?

10          MR. HUBER:  I am not aware, other than the two that

11    are charged here, that anyone else has been prosecuted.  I

12    believe there were other individuals that were aware of the

13    method of issuing of free tickets.  My understanding --

14    although this could be wrong, but my understanding was that

15    Mr. Muhammad had the greatest volume of them, which was why

16    our office and the FBI looked at him.  But, no, I -- certainly

17    my office, the Northern District of Georgia, has not

18    prosecuted anyone other than Mr. Muhammad and Mr. Brown.

19          THE COURT:  All right.  Thank you.  I think you've

20    answered all of my questions.

21          MR. HUBER:  All right.

22          THE COURT:  So go ahead with your presentation.

23          MR. HUBER:  And so as I was saying, you know, he --

24    with over 240 tickets over the course of a year, that's

25    essentially one per workday, I mean, on average.  I mean,

1    certainly, there were days he didn't issue the fraudulent

2    tickets and days that he issued multiple fraudulent tickets.

3    But it was -- this wasn't sort of a one-time passion crime.

4    It was thought out every day.  He had to decide I'm going to

5    issue another fraudulent ticket, and I'm going to steal from

6    my employer.  And, essentially, he only stopped when Delta

7    started looking into the issue, identified the issue, and

8    started looking into it.

9            And so the Government is urging a low end.  We've

10   agreed to recommend a low end.  We're urging a low-end

11   sentence of 21 months.  And as I had put in the -- in the memo

12   that I filed yesterday, you know, consistent with Eleventh

13   Circuit precedent, we believe a sentence of imprisonment

14   rather than probation as requested by Mr. Muhammad is

15   appropriate in a fraud case.  General deterrence is

16   particularly important in fraud cases under -- under the

17   Eleventh Circuit precedent.

18           It appears that Mr. Muhammad is doing -- is doing

19   well with his job.  I don't know that specific deterrence is

20   particularly a strong issue in this case.  As I said, it seems

21   from the -- from the letters that he submitted that he's doing

22   pretty well in what he's doing now, and this is the only

23   crime on -- you know, he doesn't have a criminal history.

24           But as the Eleventh Circuit said in the Hayes case,

25   sentences of little to no imprisonment do not constitute just

1  punishment for the offense, do not promote respect for the

2  law, and will not do much to deter similar activities.

3          And in a case like this where the fraud is -- is

4  calculated and repetitive, that's when deterrence can have an

5  impact, right?  If someone is thinking about doing fraud every

6  day, they have the opportunity to think about what punishment

7  might come from that fraud.  And -- and that's why, in part,

8  the Eleventh Circuit has said general deterrence is important

9  in these -- in fraud cases like this.  And so for those

10 reasons, the Government urges the 21-month sentence.  And I'm

11 happy to answer any additional questions if Your Honor would

12 have them.

13         THE COURT:  That's it.  Thank you.

14         MR. JEFFREY:  May I, Your Honor?

15         THE COURT:  Yes, Mr. Jeffrey.

16         MR. JEFFREY:  Thank you.

17         Your Honor, if it pleases the Court, we have asked

18 for, as the Court sees in the sentencing memorandum, a

19 probated sentence.  We believe that the situation here is such

20 through the factors that I mentioned.

21         First, I want to say in terms of the -- the

22 restitution that Mr. Huber mentioned, we don't dispute that.

23 We had a table, and Mr. Huber, he -- he can acknowledge -- he

24 and I had several conversations because it was kind of a

25 little bit a complex, so to speak, to try to calculate it

1  because it certainly seemed like a lot to me.

2        But having said that, at the end of the day, we

3  don't -- we're relying on the Government.  We're relying on

4  the Government saying what that restitution is in good faith.

5  And Mr. Muhammad, his -- his whole posture here has been to

6  take responsibility.  Of course, the co-defendant is far

7  behind him in that.

8        And what I can tell the Court, and I -- what I think

9  the Court heard, the last thing I want to say about the

10  restitution is that it's really not clear how much he got.  He

11  certainly didn't get anywhere near six figures, and we're just

12  going to tell the Court what he's told me, he got around

13  $10,000.  Again, that's -- it's an egregious crime.  It is

14  systematic.  There's no question about it, it's repetitive.

15  We get that right out in the open, no question about that.

16        But as far as somebody who made huge profits, I don't

17  think the Government has been able to establish that, and I

18  appreciate Mr. Huber's candor that they simply don't know.  A

19  lot of these -- like I said, it's a very unusual type of case.

20  Mr. Muhammad has acknowledged about the taxes, absolutely.  So

21  the question is:  His having come forward and accepting

22  responsibility, what is the proper sentence for the Court?

23        You know, Your Honor, I'll just very briefly go over

24  some of the points because I know that the Court has -- has

25  picked up on it, but he is somebody who has truly -- I would

1  say the last five years, and I think the Court should look at

2  what has happened in the last five years, he really has gotten

3  himself into a very promising position, having suffered a lot

4  of setbacks.

5       Now, of course, I was appointed in this case, I want

6  to say, last October or so, September or October, Your Honor.

7  And to be sure, Delta, that they came later, certainly within

8  the statute of limitations, and that's -- that's their right.

9  There's no requirement that any -- they have to do it within a

10 certain period of time, but he was in a situation where he's

11 living his life.  He's -- he's doing well, and then, of

12 course, this hit.

13      So the question is:  How did he react to that?

14 Again, we'll just note from the memorandum the setbacks he

15 suffered:  His sister being killed a few years ago, going

16 through a divorce, and losing his job because of this offense.

17 But what he has done, he's picked himself back up.  And what I

18 would submit to the Court is that -- and I've been doing this

19 for a long time.  I've never seen a client who has been this

20 forthright with an employer and has -- where the employer is

21 supporting him without qualification.  And I think those

22 letters would reveal that.  But he's at the position -- at the

23 point right now that he has gotten a promotion to the district

24 manager.  This is something which has came up.

25      And what the Court -- what I'd like to say about

1   Aquil is some of the specifics that we've heard within these

2   testimonial letters:  Somebody who is reliable, somebody who

3   is dependable, somebody who is good at defusing situations

4   that could get tense.  We heard one of the -- his friends is a

5   bartender, but those are the types of people he's dealt with.

6          He had a son who was shot just within the last

7   several months, I believe, and he has totally transformed

8   himself.  And I would like to say, Your Honor, that I think

9   this may, in a sense, have been the best thing that ever

10  happened, not that this happened to Delta, but the fact that

11  he's having to account for it because he has learned the

12  lesson well.  And we'll -- we'll ask the Court to hear briefly

13  from Mr. Muhammad.

14         By the way, his -- he has his girlfriend here,

15  Ms. Akaytra -- did I pronounce it?

16         MS. JONES:  Yes.

17         MR. JEFFREY:  Ms. Jones.  Ms. Jones, stand up, if you

18  would.  And she is here.  We'll ask if the Court would take a

19  brief statement from her as well.  But I want to let the Court

20  know she flew in from Minneapolis on his behalf, as did

21  Mr. Muhammad.

22         So what he is doing, now he coaches football, inner

23  city youth.  I don't know that much about the Saint Paul area,

24  but I do know it's -- that part of the Minneapolis metro area,

25  there are some challenges there.  You have a lot of challenged

1  youth.  This person, we've got the solid evidence he's

2  actually doing that.  He's working with those folks.  He

3  certainly lends a great amount of help to society in doing

4  that.

5        Now, what -- the last thing I would like to say is I

6  want to distinguish some -- some of the points that Mr. Huber

7  has made.  To be sure, this is a very egregious offense.

8  We -- we haven't tried to whitewash that.  Delta has a right

9  naturally -- I saw the letter.  They have a right to be very

10 distressed, to be very upset about what has happened.

11       But I would like to submit to the Court that what you

12 see in that letter, it's not trying to minimize it, but five

13 years, it -- I don't know why exactly this took five years.

14 It's within their right.  But why it did not happen sooner,

15 why they did not pursue it sooner if this -- if they have been

16 victimized to this extent?  I just put that question to the

17 Court.

18       The other thing I would like to say about the letter

19 is Delta, unlike a lot of the victims, Your Honor, we'll see

20 in this court, we see it in state courts, we see a lot of

21 individuals who are traumatized.  We've had fraud cases.  We

22 see fraud cases where individuals -- okay.  I've worked on a

23 couple of cases where you have these marriage scams.  You have

24 relationship scams.  Of course, the -- the scam we all know

25 about, you get an email, and they want you to invest

1  something.  In those cases -- and I've represented several
2  defendants who have been on the other side of those cases.
3  But we did not see the type of a victim impact statement from
4  those particular individuals.  And I suspect that part of that
5  is that we have a very professional, responsible corporation
6  here, and so I would just like the Court to take that into
7  account.
8          Again, not trying to justify it, not trying to
9  minimize it, but this is a situation where we don't have some
10 individual whose life was ruined or -- or whose life has been
11 fully set back.
12         Mr. Muhammad, from day one -- and, again, we're not
13 contesting the restitution.  We did look at it -- that is his
14 goal, that is his obligation, and he has already shown that he
15 is -- can be and is being responsible.
16         The cases that the Government produced, first of all,
17 we're -- we're not talking apples and apples.  We're talking
18 apples and oranges.  And I just got this last night.  I just
19 had a chance to look at a couple, but I did.  I'm sure, Your
20 Honor, there are other cases throughout the Eleventh Circuit
21 where district judges who gave below guideline sentences, a
22 lenient sentence, probated sentences was found to be within
23 their reasonable discretion.
24         But the cases that we have here, for instance, the
25 Hayes case, the Hayes case has a guideline range, if I recall,

1  after that defendant cooperated.  I believe the initial

2  guideline in the Hayes case was well over 100 -- okay, so 135

3  to 168 months.  That case, Your Honor, dealt with a business

4  owner who took $600,000 in bribes, and his company reaped over

5  5 million in profits as a result of the corrupt payments.  He

6  did get a variance apparently of, I believe, 57 to 67 months

7  that the Government has in there for that.  But still much

8  greater than what we see here, which, again, is a guideline

9  range of 27 to 33 months.

10       In the Martin case, in that particular case, you

11  likewise had a situation where -- let me, if I can -- if the

12  Court could give me a moment, I can give -- let's see.  It

13  does not say.  Could I have just one moment, Your Honor?

14       THE COURT:  Sure.

15       MR. HUBER:  I'm willing, I mean, to acknowledge that

16  the guideline range is -- in the case as cited in my memo, I

17  think all exceed the ranges here.  I mean, I'm happy to let

18  him continue, but I recognize that and certainly agree with

19  that, if I'm not mistaken.

20       MR. JEFFREY:  The guideline range in Martin was 108

21  to 135 months imprisonment.  And this had to do with an

22  executive from a company called HealthSouth Corporation.  This

23  was sophisticated securities fraud, mail fraud.  That

24  conviction was from 2000 and -- or that case, I'm sorry, Your

25  Honor, is from 2006.  Martin falsified numbers to inflate

1   HealthSouth's stated earnings.

2           So -- and then, finally, the last case is the Crisp,

3   C-R-I-S-P, Crisp case, which Mr. -- which the Government has

4   analogized more of the situation because the restitution

5   amount was similar, two major distinctions there.

6           In the Crisp case, the defendant there was the

7   comptroller of a corporation.  He had an executive position.

8   And to be sure, we've acknowledged that Mr. Muhammad should

9   get the breach of trust enhancement because he didn't uphold

10  that.  But we -- we submit to the Court it's a different

11  situation where you have a -- someone on the executive level

12  versus someone who's more in the customer service level.

13          The second thing you'll find in the Crisp case is

14  that defendant -- and this is on the last page of that

15  opinion -- is that the Court says there's no way, given what

16  his assets are, he's going to be able to pay any restitution.

17  We submit that that was one factor that influenced the

18  Eleventh Circuit -- again, this is another 2006 case --

19  knowing there would be no restitution paid.

20          On the contrary, we have somebody here who is

21  gainfully employed, who has picked himself up, and not only

22  shared the details of what has happened with -- with his

23  supervisors, with his managers, but they -- it's gotten where

24  they actually are living that and asking -- and thereby asking

25  the Court not to punish him.  So at the end of the day, the

1  question is:  What will be a sufficient sentence?  The Court,

2  of course, has to consider the seriousness of the offense,

3  very serious, no question about it.  It was systematic.

4        But the Court also considers the history and

5  characteristics, five years.  It happened five years ago.  He

6  has not reoffended.  He has been compliant with pretrial.  So,

7  Your Honor, he is serious about his obligation to pay

8  restitution.  He can contribute to the well-being not only of

9  his children, the inner city youth, who he is working with,

10 and he is not going to reoffend again.

11       I think that the one thing that I could say of

12 Mr. Muhammad is that he has never, not once, and this is very

13 rare, said -- try to justify what he did or try to come up, oh

14 gosh, you know, I was prosecuted for this reason, or I was

15 targeted for this reason.  He has stood up to the plate.

16       And, quite frankly, Your Honor, the reason we were

17 not before you with a plea sometime last year was not because

18 of him saying, oh, you know, I'm -- I'm not -- I'm not going

19 to plead guilty, I'm going to go to trial.  It was simply

20 because I was trying to do my due diligence because some of

21 the discovery here is just a little bit different in the sense

22 you have these spreadsheets, Mr. Huber and I spoke and so

23 forth.  But he has -- he is not going to reoffend again.

24       We would ask that the Court, again, give that

25 sentence of two years probation; we think it's reasonable.  If

1  the Court believes there needs to be some confinement, we

2  would ask the Court to consider home confinement, that he

3  would be confined to his home but be permitted to work at his

4  job, if the Court deems that appropriate.  Any other

5  conditions -- there could be more conditions, Your Honor,

6  given where he lives to help his community, to give back to

7  the community.  And, of course, most important of all, he has

8  to repay Delta.  We understand that.

9         So it's -- but if the Court believes traditional

10  incarceration is necessary and, again, we submitted it would

11  not be, but we'd ask the Court -- the guidelines are 21 to 27

12  months.  The Court, of course, does not have to go by that

13  figure.  The Court can go to 18 months, 12 months, even six

14  months.  We believe if the Court truly believes some

15  incarceration, that lesser amount would be most just to

16  satisfy any concerns the Court may have regarding the

17  seriousness of the offense.  Thank you.

18         And, Your Honor, I will -- I would like you to hear

19  from Ms. Jones and then Mr. Muhammad.

20         THE COURT:  Yes.

21         MR. JEFFREY:  If we could --

22         THE COURT:  Sure.

23         MR. JEFFREY:  -- do that.

24         THE COURT:  Ms. Jones can come on up to the podium.

25         MS. JONES:  Hello.

1          THE COURT:  Hello.

2          MS. JONES:  I just wanted to express, just because I

3    have actually known Aquil in the past and then reconnected

4    with him in the present in the last two years.  And just like

5    what I've noticed is so much growth and just how much he has

6    really transformed just from when I've known him before I

7    started -- I knew him when we used to work at the bank

8    together, and that was, like, over, you know, ten years ago,

9    so to see him where he's at now has been really like an

10   eye-opening experience in how much someone can transform in a

11   period of time.  So I just wanted to express that.

12          And also just the fact that I've seen him in action

13   with the community center working with the youth, kids that

14   are going through struggles.  Some kids that are, like, living

15   in motels that we've, like, gotten food for and have them stay

16   at our house just so they could have, like, some fun and have

17   some normal, you know, type of a childhood.  So I just wanted

18   to express, like, some of the things I've witnessed there,

19   like, some of the -- the football team and, like, we've gone

20   and, like, given kids rides and, like, just the support that

21   he's given there.  And I've seen, like, the advice.

22          And, like, even in the sense of where he's working at

23   now, which I think sometimes he doesn't even realize, like,

24   how much of an impact he makes with people.  But even his

25   employees, like, you know, giving him a gift and saying how

1  much they appreciate him.  And, like, you know, coming to him

2  with advice about outside stuff, stuff that's not even

3  necessarily work-related, and then calling him, like, uncle,

4  like, having that kind of an impact to make them want to come

5  to work.

6        So sometimes when people are calling in, they can

7  call him and be, like, yeah, if you're going to be there,

8  we'll come in.  You know, so it's just, like, inspiring.

9  It's, like, he makes a lot of impact wherever he goes and

10  within his group and his friends.

11        And then, like, with his children as well, I've seen

12  him really help transform his oldest son's life.  Like, the

13  lawyer said, like, he -- his son was shot earlier this year,

14  and that was a big thing going on back in his hometown.  And,

15  like, to be there for him and support him and help guide him

16  from that space to where he's at now where he got to graduate

17  from high school and, like, move forward, so just a lot of

18  impact that he's made.

19        So I just wanted to be able to kind of showcase that

20  part of it.  I know this is all serious stuff, but he's also,

21  like, done a lot of great things since then and continues to

22  do great things.  I just -- I just wanted to showcase that.

23        THE COURT:  Thank you.

24        MS. JONES:  Thank you.

25        MR. HUBER:  May I address just one point about the

1  timing of the indictment?  And I only wanted to do this

2  because I -- obviously, the indictment was brought when it was

3  brought.  But Delta actually came to the FBI in 2018, in late

4  2018, for -- the agent who was assigned to the case had some

5  personal health issues in 2019, and then the COVID pandemic

6  hit, which stopped us from being able -- the FBI from being

7  able to go to Minnesota for interviews.  And so, yes, there

8  was a delay.  It was not on Delta's part.  It was on the U.S.

9  Attorney's and the FBI's part, the delay.

10        I just didn't want -- particularly, given that we

11 have some folks from Delta here, I didn't want them to

12 unfairly shoulder the blame for the delay when it was the

13 Government's -- I don't want to say fault, but the reasons

14 were ours rather than Delta's.

15        THE COURT:  Thank you.

16        Of the cases you-all have both talked about this

17 morning, does anyone know what the sentences were after, I

18 guess, the Eleventh Circuit said those sentences are too low?

19 Do you know what the district court actually did after?

20        MR. HUBER:  I don't.  Even though I've used this memo

21 several -- a similar memo several times, I've never been asked

22 that question, and so I haven't actually gone back and looked.

23        I do -- I do know that -- I don't actually think it's

24 any of the cases cited here.  I do know that we had a case out

25 of this office that had a similar issue where there was a

1   probationary sentence, in fact, twice, came back and

2   ultimately ended up in the low, you know, year to two-year

3   range, which was, I think, below the guidelines, but -- but

4   was a -- it was an incarceration sentence, but I don't know

5   what the sentences were for those particular cases.

6           THE COURT:  Thank you.

7           THE DEFENDANT:  Good morning, Your Honor.

8           THE COURT:  Good morning.

9           THE DEFENDANT:  So I do want to start by saying I

10  definitely acknowledge my mishap.  I definitely acknowledge

11  that what I did was wrong, completely wrong.  I definitely do

12  not want to take away from what I did wrong.  I do understand

13  that in the position that I am at, regardless of how long it

14  was, there's definitely got to be some consequences for that

15  as well.  I completely understand that 100 percent.

16          But I also do want to express that prior to that,

17  I've never had any criminal history at all, never been in

18  trouble with the law.  Even afterwards, I still have not been

19  in trouble with the law.  The reason why, prior to this, I had

20  great employment.  I was a warehouse manager at the airport.

21  This case did come up.  Because of this type of case, they did

22  have the release of my employment.

23          From there, I did continue to move on.  I did

24  continue to pick up another job.  I also continued to --

25  continued to stay in my son's life as well.  I do have full

1 custody of my older son as well.  That right there actually

2 changed my life.  I want to say that changed my life probably

3 about three or four years ago.  When he came into my life, it

4 had me -- made me look different.  Yes, he's always been in my

5 life, but to have him there full-on with me made me look at

6 life different on how I need to actually show that example to

7 him.  But not just him because I also learned -- I have a

8 younger son as well that decided to come over whenever he

9 wants type deal, which is amazing because I -- I had made a

10 great impact on both of their lives.

11        My younger son, I do coach him in football as well.

12 He just recently joined the team.  He was, like, well, Dad,

13 you're too hard on the boys.  I don't want to be part of that.

14 But for him to actually join in the seat, yes, I'm hard on you

15 even more because you're my son.  I need you to be great.

16 That's how I look at it with these kids.  I'm also even harder

17 now in my community.

18        My -- by me coaching football at the Community

19 Center, I also run a Big Brothers program there as well.  The

20 reason why I decided to do that is because I've watched so

21 many of, like, minority children in that neighborhood either

22 shot, taken to jail, being abandoned by their parents.  So

23 many things I've watched happen in that community that I

24 decided to put myself primary into there and try to help them

25 as much as I can.

1           With my job, just on Monday, I just got actually

2    offered a promotion to be the district manager, so that right

3    there is another thing that's positive that happened in my

4    life as well.  And for me -- but, again, it all goes back to

5    me as in my two boys.  I'm asking the Court today to please

6    allow me to stay with my family, to stay continually helping

7    my community.  At the same time, I will honor and pay any

8    restitutions to take care of -- I know this -- again, like I

9    said, regardless of how long it happened, five, six, seven,

10   ten years ago, I cannot take away from the wrongdoings that I

11   did, Judge, and I will -- I still would like to make that

12   right as well, Your Honor.

13          But, again, like, my boys are my main thing.  And

14   when I say my boys, I don't just mean my two sons.  I also go

15   with my boys as my football team that I coach as well.  My

16   boys are also the same boys that I help in the community.

17   Those are all my boys that I love to help.

18          I'm just asking the Court to please take that into

19   consideration and to let me continue to do my work that I have

20   been doing, and to give me an opportunity to make whole with

21   Delta as well.  Thank you, ma'am.

22          THE COURT:  If you are sent to prison, what would --

23   where would your oldest go?

24          THE DEFENDANT:  I haven't figured that out yet, Your

25   Honor.  That would be something that I would have to kind of

1   figure out as well to see where he would go, where he would

2   kind of live.  Because right now, he is with me, so I kind of

3   have to figure that out.  I have not figured that out yet,

4   Your Honor.  I do apologize I don't have a full answer for

5   that question.

6          THE COURT:  And I'll ask Mr. Jeffrey, but if you feel

7   comfortable, you can answer it.  I guess I just still don't

8   have a sense of what led Mr. Muhammad to do this.  Was it

9   helping family thinking Delta won't miss it?  Was it just

10  greed or -- I don't know.

11         MR. JEFFREY:  I guess I'll leave that with

12  Mr. Muhammad, Your Honor.

13         THE COURT:  And you don't have to answer.  I just --

14  that's a question of mine because I've heard from your

15  girlfriend about how much growth.  Mr. Jeffrey has talked

16  about it, but it's hard for me to measure that when I don't

17  really know what your mindset was --

18         THE DEFENDANT:  Correct.

19         THE COURT:  -- at the time of the offense.

20         THE DEFENDANT:  Do you mind if I just discuss with

21  Mr. Jeffrey?

22         THE COURT:  Yeah.  Yeah.

23         THE DEFENDANT:  Thank you.

24         (Whereupon, the defendant is conferring with defense

25  counsel.)

1          THE DEFENDANT:  Oh, so, well, actually, what really

2   led me to that situation is at the time, I was struggling for

3   money.  When I was struggling for money, at the same time, I

4   have an older brother, who I've been looking out for.  Even

5   though he's my older brother, I still been looking out for

6   him.  He basically needed to go into a drug rehab center, but

7   he had to go into a live-in drug rehab, and it was -- which

8   was a little expensive.

9          Also my mother was going through breast cancer as

10  well.  This is when she first hit, and everything was just --

11  money was piling up, and my family needed help.  The

12  opportunity was presented to me through my co-defendant and --

13  because he knows about it, and he'd done it before.  And

14  that's what led me to head down -- to head down that route.

15         THE COURT:  Thank you.

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  All right.  Anything else from either

18  party?

19         PROBATION OFFICER:  Your Honor, if I may?  Due to the

20  two-level reduction for 4C1.1, the fine did change.  It went

21  from 10,000 to 100,000 to 10,000 to $95,000.

22         THE COURT:  All right.  I don't plan on imposing a

23  fine, so I'm just not even sure.  Is that what other judges

24  are doing when they do the variance changing of fine, or are

25  we treating it kind of like a -- under a 3553(a) variance?

1          PROBATION OFFICER:  If you're treating it as a 3553,

2    it shouldn't matter.

3          THE COURT:  Okay.

4          PROBATION OFFICER:  But I was just going off of a

5    different sentencing I had with you.  When we added that, we

6    changed it.

7          THE COURT:  All right.  Well, then, thank you for

8    keeping track of what I've done before, so I will just amend

9    my findings on the fine guideline range.  You said it was

10   10,000 to $95,000?

11         PROBATION OFFICER:  Correct.

12         THE COURT:  All right.  As I said, I don't plan on

13   imposing a fine anyway, but just so it's right for the record.

14         All right.  Let me take a little break to think this

15   over.  We will come back at 11:00.

16         (Whereupon, a recess was taken.)

17         THE COURT:  All right.  This one is a very difficult

18   one for me, Mr. Muhammad.  I've been thinking about it for

19   days, and then after reading all of the submissions, it's a

20   difficult case because I'm very troubled by the amount of

21   times that you did this.  As Mr. Huber pointed out, it could

22   be effectively one a day, even if it really wasn't one a day,

23   but that's just so many times to decide to defraud your

24   employer.  And this certificate sort of covered your tracks.

25   And so that part of it is very troubling to me, and it's why I

1  cannot go as low as your lawyer has requested, which is

2  probation.

3      I do think that the nature and circumstances of the

4  offense require some time in prison.  And so then I -- I have

5  to consider other things about the offense, which I think are

6  mitigating, which Mr. Jeffrey pointed out, which is this --

7  Delta was definitely harmed.  There's no doubt in that.  But

8  this is not the same as a case where we have individuals who,

9  for example, have lost all of their life savings, who --

10  companies who are going to be put out of business or have been

11  seriously harmed.

12      And then in terms of the offense, when I think about

13  what you personally gained from it, there seems to be a big

14  discrepancy between the loss of 447,000 and then you getting

15  maybe 10,000, maybe 20,000, I don't know, but that's a big

16  discrepan -- discrepancy in unlike many of our fraud cases

17  where you see the person who I'm sentencing is the one who

18  actually received the benefit, and so I find that to be

19  mitigating.

20      And then in terms of your history and

21  characteristics, you don't have any criminal history, and you

22  have received the benefit of the Government's delay in terms

23  of now I can see what you've been doing since you left Delta,

24  and there's no indication that you've been engaged in any

25  illegal activity or fraudulent conduct, so that speaks to your

1  character in a positive way.

2        And the -- the guideline range, in my opinion, based

3  on those factors, is too high.  Although I have considered it,

4  I think it's too high, so let me see.  In terms of deterrence,

5  I agree with Mr. Huber that maybe specific deterrence is not

6  as strong of a factor here because of your conduct since.  But

7  I do think that general deterrence or deterrence, at least to

8  other Delta employees who had the same access or the ability

9  to issue tickets, that is a position of trust.

10       And I think -- I imagine there are thousands of

11 representatives like you who don't have a criminal history and

12 maybe think this isn't such a big deal, and I have to send a

13 message.  I think that is important to send a message to them

14 that this level of fraud could result in a prison sentence.

15 And then I also balanced the need for you to repay the money

16 and consider that any time that you spend in prison, you're

17 not going to be able to repay it, and your lawyer seems to

18 have a lot of confidence that you will be able to repay it, so

19 the quicker you get the prison sentence behind you, the

20 quicker you can get back to paying it.

21       So in terms of the number, I am going to impose a

22 sentence of six months in prison, followed by three years of

23 supervised release.  And there will be a special assessment of

24 $100, which is due immediately, and should be paid to the

25 clerk of the United States District Court, Northern District

1  of Georgia.

2        You are ordered to make restitution in the amount of

3  $447,876, payable to the clerk, the United States District

4  Court, Northern District of Georgia.  And restitution shall be

5  paid in full immediately, but then we are -- let me just read

6  it.  It says you must pay the above-noted financial penalties

7  in accordance with the schedule of payment sheet of the

8  judgment.  Payment of criminal monetary penalties is due

9  during the period of imprisonment.

10        Any balance that remains unpaid at the commencement

11  of the term of supervision shall commence within 60 days after

12  release from imprisonment on the following terms:  Payable at

13  a rate of no less than $250 monthly to the U.S. District Court

14  clerk.  And you must notify the Court of any changes in

15  economic circumstances that might affect the ability to pay

16  this financial penalty.

17        The Court finds that you do not have the ability to

18  pay the interest on the restitution, and so I will waive that

19  requirement.  And you do not have the ability, as I noted

20  earlier, to pay a fine and cost of incarceration, so I will

21  waive the fine and cost of incarceration.

22        While you are on supervised release, you must comply

23  with the mandatory conditions of release, which are you must

24  not commit another federal, state, or local crime.  You must

25  not unlawfully possess a controlled substance.  I will suspend

1  the mandatory drug testing requirement based on my

2  determination that you pose a low risk of future substance

3  abuse.  You must make restitution in accordance with 18 United

4  States Code Sections 3663 and 3663(a).  And you must cooperate

5  in the collection of DNA as directed by the probation officer.

6  And as part of supervised release, you will be -- you must

7  comply with the standard conditions of supervision, which will

8  be included in the judgment that you receive.

9       And then I'm going to impose the following special

10  conditions:  You must submit your person, property, house,

11  residence, vehicle, papers, computers, or other electronic

12  communications or data, storage devices or media or office to

13  a search.  This search must -- can only be conducted if the

14  officer believes there's reasonable suspicion that you

15  violated a condition of your supervision and that areas to be

16  searched contain evidence of this violation.

17       You must permit confiscation and/or disposal of any

18  material considered to be contraband.  You must make a full

19  and complete disclosure of your finances and submit to an

20  audit of your financial documents at the request of your

21  probation officer.  You must not incur new credit charges or

22  open additional lines of credit without the approval of the

23  probation officer.  You must complete 250 hours of community

24  service.  The probation office will supervise your

25  participation in the program, and you must provide written

1  verification of completed hours to the probation officer.

2          All right.  And I've sort of gone through my

3  reasoning on how I reached this sentence.  But I did consider

4  all of the factors in 18 U.S.C. Section 3553(a) and believe

5  that this sentence is a reasonable sentence.  And I think the

6  three-year term of supervised release is recommend -- is

7  reasonable because I want to make sure that the probation

8  officers can monitor you paying back the restitution in the

9  case.  I think that's it.

10          Mr. Huber, any objections to the sentence, the manner

11  in which it was imposed?

12          MR. HUBER:  The Government objects to the extent that

13  it's a below guideline sentence, Your Honor.

14          THE COURT:  Mr. Jeffrey?

15          MR. JEFFREY:  Your Honor, we would just respectfully

16  object to the jail sentence.  I did have one question for the

17  Court.

18          THE COURT:  Sure.

19          MR. JEFFREY:  Would the Court possibly be willing

20  after Mr. Muhammad completes his sentence to have maybe a

21  six-month grace period before the restitution payments start

22  simply so he could get reestablished financially?

23          THE COURT:  Sure, I can do that.  I -- I think my

24  experience is that probation will generally work with people,

25  but I do understand it took him a few months.  How about three

1  months to give him some time?

2          MR. JEFFREY:  Okay.

3          THE COURT:  And then my experience is probation will

4  work with him based on his finances.  If the $250 a month is

5  too high, they -- they could also adjust that, but I'd say

6  three months.

7          MR. JEFFREY:  Very good.  Thank you, Your Honor.  And

8  he -- he'd request a recommendation to BOP to be placed near

9  the Minneapolis, Saint Paul area.  And then I don't think

10  there's an objection from the Government that he be permitted

11  to self-report?

12          MR. HUBER:  Correct.  No.  Right, no objection.

13          THE COURT:  All right.

14          So, Mr. Muhammad, I will make the recommendation that

15  you be designated to a facility that is close to the

16  Minneapolis, Saint Paul area.  I just want you to know that

17  that is just a recommendation.  The Bureau of Prisons has the

18  final say.

19          And I will also allow you to voluntarily surrender,

20  so what that means is you will receive a letter stating where

21  and when you are supposed to report for service of the

22  sentence.  Until that happens, until you report, you will

23  remain on the same conditions of bond that have been

24  previously set.  And if you do not show up as you are ordered

25  to do so, then you could face additional charges and

1    penalties.  Do you understand that?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  All right.  Anything else?

4              MR. HUBER:  Not from the Government, Your Honor.

5              MR. JEFFREY:  Nothing from the defense.  Thank you,

6    Your Honor.

7              THE COURT:  All right.  Thank you-all.

8              Mr. Muhammad, good luck to you.

9

10             (Whereupon, the proceedings were concluded at

11   11:21 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTERS CERTIFICATE

2

3

4         I, Keisha M. Crump, Official Court Reporter for the

5   United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7         That I reported on the Stenograph machine the

8   proceedings held in open court; that said proceedings in

9   connection with the hearing were reduced to typewritten form

10  by me; and that the foregoing transcript is a true and

11  accurate record of the proceedings.

12        This the 15th day of AUGUST, 2023.

13

14

15                              /S/ Keisha M. Crump, RMR, RCR
                                Official Court Reporter
16                              United States District Court
                                Northern District of Georgia
17

18

19

20

21

22

23

24

25